# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 13-5013-CR-S-BCW |
| JEFFREY D. MANLEY, | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. Defendant Jeffrey D. Manley filed a Motion to Suppress Statements in the matter (Doc. 24). Manley argues that any and all statements made to law enforcement prior to receiving *Miranda* warnings should be deemed inadmissible at trial in violation of the Fifth and Sixth Amendments, as should statements made after *Miranda* because they were "tainted" by prior constitutional violations. A hearing was held on the motion on April 9, 2014. Defendant Manley was present with counsel, Stacie R. Bilyeu. The United States was represented by James J. Kelleher. For the reasons set forth below, **IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements be **DENIED**.

### FINDINGS OF FACT

Detective Jeff Romero testified at the hearing that in January 2013 he supervised the Cyber Crimes Unit of the Nixa, Missouri, Police Department. Detective Romero testified that the Regional Internet Crimes office detected a computer involved in child pornography. Using the Internet Protocol (IP) Address, law enforcement traced the computer to Defendant Manley. Internet Service Provider (ISP) CenturyLink indicated Manley's service address as 77 Fairwood

Road, Lampe, Missouri. On February 25, 2013, police obtained a warrant to search that address, which they believed was Manley's home. The next day, they executed the warrant at 77 Fairwood to find that Manley did not reside there, but at 175 Fairwood Road in Lampe. Detective Fields left the scene to apply for a search warrant for the correct address, while the other detectives and officers proceeded to Manley's residence down the road. There was no answer to the knock on the door of Manley's residence, so officers waited in the street and in Manley's driveway for Detective Fields to return with the search warrant.

While they were waiting, Defendant Manley arrived by car and stopped in the road in front of the house. His daughter and an alleged victim were passengers. Detective Romero and Detective Orville Choate identified themselves and asked Manley to pull his car into the driveway to speak with the officers. Manley complied, and exited the car. The officers stated they were investigating a computer at his residence for child pornography. Manley replied, unprompted, that there was "some of that" on his computer. Detective Choate asked Manley to clarify whether he meant that his computer contained child pornography. Manley replied, yes.

Manley then called his mother on his mobile phone and asked her to pick up the girls. Officers did not question Manley while waiting for his mother to arrive. Manley was allowed to return to his vehicle to retrieve his ID, although an officer secured the vehicle first by removing a handgun from it.

When his mother arrived, Manley told her that the police were there to investigate downloading of child pornography. His mother stated that it could be downloaded accidentally. Manley told her that some of it was accidental and some of it was not. Police were not a part of this conversation, but could hear it from their vantage point. Manley's mother placed the girls in

her vehicle. Manley was allowed, with Detective Choate as an escort, to say goodbye to his daughter.

Detective Choate asked Manley for consent to search the house without a warrant. Manley denied the request. Later, after his mother and daughter had departed, Manley gave Detective Choate permission to search the residence because "the end result will be the same." Detective Choate replied that they would wait for arrival of the warrant. Due to the cold temperature, Manley asked if they could wait inside the house.

After the detectives had performed a "safety sweep" to ensure no one else was in the house, they waited with Manley in the kitchen. Officers allowed Manley to use the restroom by himself. When Manley returned to the kitchen, after approximately ten minutes, Detective Romero advised him of his *Miranda* rights and questioned him regarding the alleged downloading of child pornography. Manley made several admissions to the detectives. During the course of that interview, Detective Fields returned with a search warrant, and the detectives searched the house. At the conclusion of the interview, Manley invoked his right to an attorney. Detective Romero immediately ceased questioning him. Detective Romero testified that police first arrived at Manley's residence at 1:40 p.m., and Detective Romero read him his Miranda rights at 2:14 p.m.

Detective Orville Choate also testified at the hearing. He related that after he and Detective Romero informed Manley that they were investigating the downloading of child pornography, Manley stated that he had some on the computer in his house. Detective Choate reported that he was surprised that Manley made that admission so freely, so Detective Choate asked him to clarify. Manley reiterated he had downloaded and possessed child pornography. Manley, standing at the end of the driveway, called his mother using his cell phone, but only

after Detective Choate looked at the phone to ensure that Manley was making a phone call, and not using the phone for another purpose. Detective Choate heard Manley tell his mother he had downloaded child pornography.

Manley's mother arrived at the house about twenty minutes later. Manley told her, within hearing distance of Detective Choate, that the investigation was about him downloading child pornography. She told Manley that was stupid, and turned to Choate and said it was probably accidental. Manley then told his mother that it was partially accidental and partially purposeful. Manley told Choate that he wanted to speak with his daughter before Manley's mother left with the girls. Manley hugged and spoke briefly with his daughter. Choate stood nearby, but did not interfere with that interaction.

After Manley's mother had left with the children, Detective Choate asked for Manley's consent to search the house and computer. Manley told Choate that he wanted to wait for the search warrant. After a few minutes, Manley requested that they wait inside the house, due to the cold temperature. Detective Romero took Manley inside, while Detective Choate walked down the road to find a stronger cell phone signal. He called Detective Fields, who informed him that the search warrant had been signed by the judge. When Detective Choate returned to the house, Detective Romero was already interviewing Manley at the kitchen table.

## CONCLUSIONS OF LAW

In *Miranda v. Arizona*, the Supreme Court held that a criminal suspect must be informed of his right to be free from self-incrimination and the right to counsel before a custodial interrogation by law enforcement. 384 U.S. 436, 444 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To determine whether a

suspect is in custody, a court looks to the "physical or psychological restraints" placed upon the suspect in comparison to whether a "reasonable person in the suspect's position" would have understood him or herself to be in custody. *United States v. Griffin*, 922 F.3d 1343, 1347 (8th Cir. 1990) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). The court's "ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). A court looks to the totality of the circumstances surrounding the interrogation, s*ee Griffin*, 922 F.3d at 1347 (citing *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989)), and determines in light of those circumstances whether a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave," *LeBrun*, 363 F.3d at 720 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). If a reasonable person in the suspect's circumstances would have considered his freedom to move about or leave the scene curtailed, and his or her belief was objectively reasonable, then the suspect is considered "in custody." *Griffin*, 922 F.3d at 1347 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Fourth Amendment concerns also come into play when a suspect is detained for investigatory purposes prior to arrest. Under *Terry v. Ohio*, 392 U.S. 1 (1968), law enforcement may detain a suspect for investigation on "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Morgan*, 729 F.3d 1086, 1089 (8th Cir. 2013) (quoting *Terry*, 392 U.S. at 30) (other citations omitted). Reasonable suspicion is determined by looking at the totality of the circumstances. *Morgan*, 729 F.3d at 1089. The scope of a *Terry* detention is limited, and an investigatory detention may turn into an arrest if it lasts for an unreasonable amount of time or is accompanied by unreasonable use of force. *Morgan*, 729

F.3d at 1090. Persons detained temporarily and legitimately pursuant to *Terry* are not, however, "in custody" for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984).

The Supreme Court's decisions describe a three-tiered hierarchy of police-citizen encounters: first, consensual encounters involving no coercion or restraint; second, "brief, minimally intrusive" contacts that must be supported by a "reasonable suspicion of criminal activity," and third, "highly intrusive, full-scale arrests, which must be based upon probable cause." *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983).

For ease of analysis, the Court enumerates Manley's statements as follows: 1) Manley's initial statement to police that he had downloaded child pornography; 2) Manley's admissions to his mother that he had downloaded child pornography; 3) Manley's statement permitting detectives to search the house before the warrant arrived because "the end result will be the same;" and 4) Manley's post-Miranda statements.

*Manley's initial incriminating statements to police*

Both Detectives Romero and Choate testified that Manley stopped his vehicle in the street outside his home. The Detectives asked him to pull into the driveway and get out of the car to speak with them. Manley complied. When Manley exited the car, Detective Choate informed him that officers were there to investigate downloading of child pornography. Manley responded, unsolicited, that he had downloaded child pornography on his computer. Detective Choate then asked him to clarify his statement, which Manley did, reiterating that he had downloaded child pornography.

Considering the totality of the circumstances, Manley was not "in custody" when he made these statements, thus they are admissible despite the lack of *Miranda* warnings. Manley voluntarily pulled his vehicle into the driveway from the street and voluntarily exited his vehicle.

6

His discussion with the detectives was consensual. He was under no duty to answer any questions at that point, nor was he coerced or intimidated in any way. In fact, his statement that he had downloaded child pornography was not even responsive to a question from the detectives, thus it was not an "interrogation." The detectives had merely introduced themselves and stated the purpose of their investigation. Manley offered the information unsolicited.

Assuming *arguendo* that Manley was not free to leave the driveway, any detention fell far short of a formal arrest triggering *Miranda*, and was more akin to a *Terry* stop. At that point, Manley had volunteered that he had downloaded child pornography. This fact, coupled with the evidence the detectives had used to procure the search warrant, namely, information that child pornography had been downloaded to an IP address used by someone at Manley's residence, was a sufficient basis for a reasonable suspicion that would justify a *Terry* detention. It is well-settled that legitimate detentions pursuant to *Terry* are not "in custody" interrogations under *Miranda*. *See Berkemer*, 468 U.S. at 440. Thus, the Court cannot recommend that the statements resulted from an in-custody interrogation requiring police to issue *Miranda* warnings.

### *Manley's inculpatory statements to his mother*

The undersigned further recommends that Manley's admissions to his mother that he had downloaded child pornography are also admissible. There is no dispute that Manley's statements to his mother were not responsive to inquiry from law enforcement. Thus, they were not part of an interrogation contemplated by *Miranda*. The Court, however, also looks at the totality of the circumstances to determine whether Manley was "in custody" at that point.

It would not be unreasonable to find that Manley was not entirely free to leave at that point. Yet, the Court finds, similar to the scene of the initial admissions directed to the detectives described above, that Manley's detention did not rise to the level of a formal arrest.

The interaction took place in Manley's front yard; Manley was not handcuffed or physically restrained; Manley was not prevented from speaking with his mother; police did not interfere with Manley's communication with his mother; police were not surrounding him, although the detectives were within earshot; Manley was allowed to walk to his mother's vehicle to say good bye to his daughter; and Manley was freely allowed to hug and console his daughter. Based on these factors, the Court recommends that Manley's detention at that point was equivalent to a *Terry* stop, and it was based upon reasonable suspicion that Manley had committed the crime he had, by that time, twice admitted to. Nor was his detention illegal because reasonable suspicion existed to detain him temporarily pursuant to *Terry*. Thus, Manley's statements to his mother are admissible even though Manley had not yet been read his *Miranda* rights.

*Manley's second inculpatory statement to police*

Manley initially denied consent to search his home without a warrant. Thus, Manley and the officers waited outside for Detective Fields to return with a warrant. Before Fields returned, however, Manley told police to proceed with their search because "the end result will be the same."

The Court does not need to belabor the issue as to whether the defendant was in custody for purposes of *Miranda*, because, like the first two statements discussed above, Manley's statement was a spontaneous utterance not resulting from police interrogation. Thus, *Miranda* was not implicated. Moreover, Manley was properly detained under *Terry* upon reasonable suspicion of the detectives that Manley had downloaded child pornography.

*Manley's post-**Miranda** statements to police*

Manley entered the house with detectives. After a protective sweep for other individuals, he was allowed to use the restroom. After Manley exited the restroom, Detective Romero

8

advised him of his *Miranda* rights. Manley stated he was willing to answer questions regarding the investigation. At some point during the interview, Manley asked for an attorney, and questioning was terminated.

Manley was advised of his *Miranda* rights, and agreed to speak with law enforcement. Manley argues, however, that the post-*Miranda* statements are not admissible under a fruit-of-the-poisonous-tree theory, meaning that his post-*Miranda* statements are inadmissible because his pre-*Miranda* statements were obtained in violation of the constitution and therefore not admissible. This argument is meritless. As stated above, Manley was not in custody at the time he made the first three statements. Manley's initial contact with officers was consensual. His statements to his mother were not made in response to questions from law enforcement, thus they were not part of an interrogation. As the undersigned reasoned above, to the extent Manley was not free to leave the scene, he was detained pursuant to *Terry*. The entire encounter, including the consensual contact and non-interrogative statements, lasted less than 35 minutes, approximately ten of which Manley was in the restroom. In consideration of the totality of the circumstances, the undersigned recommends Manley's 35-minute pre-*Miranda* detention was reasonable.

Manley's fruit-of-the-poisonous-tree theory is therefore inapposite because there was no unconstitutional taint flowing from the first three statements. Furthermore, there is no evidence of or argument that Manley was coerced into speaking with detectives about the investigation and no argument that his waiver of *Miranda* rights was not voluntary, knowing, and intelligent. *See United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). Thus the undersigned recommends that his statements to police after *Miranda* warnings were given should be admissible at trial. Taken together, the undersigned recommends that Defendant Manley's

constitutional rights were not violated the day of the execution of the search warrant.

## CONCLUSION

Therefore, based on all the foregoing, and pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1 of the United States District Court for the Western District of Missouri, the undersigned hereby **RECOMMENDS** that the Motion to Suppress Statements (Doc. 24) be **DENIED**.

**IT IS SO ORDERED.**

**DATED: June 10, 2014**

          /s/ *David P. Rush*
          **DAVID P. RUSH**
          **United States Magistrate Judge**